IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH GRANT,                   ) | No. C 04-2449 SBA (PR) |
|                      ) | |
|        Petitioner,    ) | **ORDER DENYING PETITION** |
|   v.                ) | **FOR WRIT OF HABEAS** |
|                     ) | **CORPUS** |
| A. P. KANE, Warden,      ) | |
|                     ) | |
|        Respondent.   ) | |
| _____) | |

## INTRODUCTION

Keith Grant, a prisoner at the Correctional Training Facility at Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now submitted for the Court's consideration of the merits of the petition. For the reasons discussed below, the petition is DENIED.

## PROCEDURAL BACKGROUND

In 1993, Petitioner pled guilty to second-degree murder and to using a firearm in the commission of the murder. (Resp't Ex. A, Abstract of Judgement; Resp't Ex. B, Plea of Guilt/No Contest - Felony.) Petitioner was sentenced to sixteen years to life in prison. The present petition does not challenge Petitioner's underlying conviction. Rather, it challenges the denial of parole suitability by the Board of Prison Terms ("BPT") held in 2002.[1]

On June 24, 2002, the BPT denied Petitioner parole. (Resp't Ex. F.) The BPT identified several factors in support of its determination that Petitioner was not suitable for parole. The factors identified included the circumstances of the murder, Petitioner's prior criminal and unstable social history, his inadequate performance in prison (i.e., two write ups in 1993 and 1996 while housed in

_____

[1] The BPT was abolished on July 1, 2005 and replaced with the Board of Parole Hearings ("BPH"). See Cal. Gov. Code § 12838.4. The Court will continue to use "BPT" to denote the past actions of the BPH, the real party in interest.

the California Youth Authority as well as confidential materials indicating that he was involved in "disruptive activities" in 1999 and 2000), his need for additional self-help and/or therapy programs, and the District Attorney's opposition to parole.  (Id.)

Petitioner sought relief from the California courts.  In 2003, the San Diego County Superior Court denied his petition for a writ of habeas corpus in a reasoned order.  (Resp't Ex. J.)  The California Court of Appeal also denied his petition in a reasoned order.  (Resp't Ex. K.)  The California Supreme Court summarily denied his petition for review.  (Resp't Ex. L.)

On June 21, 2004, Petitioner filed the present petition challenging the denial of parole at his 2002 hearing (docket no. 1).  As grounds for federal habeas relief, Petitioner asserts that: (1) the BPT's denial of parole based on the unchanging circumstances of his offense and prior history and other unsubstantiated allegations violated his right to due process and deprived him of his liberty interest; (2) his plea agreement is invalid under the Due Process Clause as the BPT and the District Attorney withheld his reciprocal benefit of lessened punishment by re-characterizing his offense as a higher degree than that to which he pled guilty; and (3) the BPT is systematically biased in their decision making by denying parole to almost every inmate and 100% of administrative appeals in violation of state law requiring parole normally be granted, depriving Petitioner of his rights under the Due Process Clause.

In an Order dated June 17, 2005, the Court ordered Respondent to show cause why the petition should not be granted (docket no. 4).  On August 11, 2005, Respondent filed an answer (docket no. 7).  On October 14, 2005, Petitioner filed a traverse (docket no. 9).  The Court will proceed to consider the merits of Petitioner's due process claim relating to the 2002 parole denial.

## STANDARD OF REVIEW

### I.     AEDPA

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

2

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004), cert. denied, 126 S. Ct. 484 (2005).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**A.    Section 2254(d)(1)**

Challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U. S. 63, 70-73 (2003).

**1.    Clearly Established Federal Law**

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from

3

[the Supreme] Court is, at best, ambiguous." <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  <u>See, e.g.</u>, <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court.  <u>Williams</u>, 529 U.S. at 391.  There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established."  <u>Andrade</u>, 538 U.S. at 64-65.  When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework.  <u>See id.</u> at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established."  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir.), <u>cert. denied</u>, 540 U.S. 968 (2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

### 2.   **"Contrary to"**

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  <u>Williams</u>, 529 U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of § 2254(d).  <u>See</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3.   **"Unreasonable Application"**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 412-13.   "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>accord</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it.  <u>Holland v. Jackson</u>, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable-standard is not a clear error standard.  <u>Andrade</u>, 538 U. S. at 75-76 (rejecting <u>Van Tran</u>'s use of "clear error" standard); <u>Clark</u>, 331 F.3d at 1067-69 (acknowledging the overruling of <u>Van Tran</u> on this point).  After <u>Andrade</u>, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." <u>Id.</u>  In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result.  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003).

**B.**     <u>**Section 2254(d)(2)**</u>

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where the state court fails to consider and weigh

5

highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state-court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### C.    Review of Parole Suitability Decisions

The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions. See Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); see also McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review under § 2254 applies to such decisions).

## II.    Exhaustion

Prisoners in state custody who wish to challenge collaterally in federal habeas corpus proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987). It is undisputed that Petitioner exhausted his state court remedies as to the claims raised in his federal petition.

### FACTUAL BACKGROUND

Although Petitioner is not challenging the validity of his underlying criminal conviction, the facts regarding the commitment offense were relied upon by the BPT to deny Petitioner parole in 2002. The facts regarding the circumstances surrounding the offense were read into the record at the hearing, were not objected to by Petitioner, and are in accord with those summarized in the probation report prepared for the sentencing court after Petitioner's conviction. The Court includes that summary here:

On August 27, 1992, at approximately 8:00 p.m., Salvador Hernandez Pantoja . . . was standing at the intersection of 8th Avenue and Quince Street . . . in

United States District Court
For the Northern District of California

Escondido with several friends and relatives. The group was socializing after they had just finished fixing the stereo in Pantoja's automobile. A tan station wagon approached the intersection of 8th and Quince very slowly . . . almost stopping. At least three shots were fired from the station wagon. The second shot struck Salvador Hernandez Pantoja in the head.

. . . .

Salvador Hernandez Pantoja's nephew and other friends put him in their vehicle and drove him to the hospital. The projectile had entered the right temple, penetrated the skull and perforated his brain causing (inaudible) hemorrhages.

. . . .

Salvador Hernandez Pantoja died as a result of the gunshot. [He] was 37 years old and the father of three children who resided in Mexico. Raul Lopez, Keith Grant, Lades Cobb, hereinafter Lopez, Grant and Cobb are responsible for the murder of Salvador Hernandez Pantoja. The events that led to the murder began earlier that afternoon. The late afternoon of August 27, 1992, Raul Lopez went to Orange Glen High School to see his brother regarding a baseball cap. Lopez is a quote, "Veteran," end quote, Diablo Gang Member from Escondido. Lopez's gang moniker is "Goodfy" . . . . At the high school he came in contact with Lades Cobb. . . Cobb is a West Coast Cripp who goes by the gang moniker "Lilskee" . . . . Cobb was driving a stolen (inaudible) station wagon. The station wagon had been stolen between August 23rd and 24th, 1992.

During the afternoon, Cobb and Lopez came in contact with several of their friends, including Keith Grant, the Garcia brothers, Oscar and Raphael, . . . Angelica Rivera and Mike Richardson. Grant is Diablo Gang Member who goes by the gang moniker, quote, "Frosty," end quote. The group ended up at 260 North Midway where several of them drank and Lopez discussed his plans to do a "drive by" shooting.

. . . .

Lopez indicated he had been quote, "hit up," end quote, by an individual whose name was quote, "Chunky," end quote, from Westside. Westside is a rival gang to the Diablos in Escondido. Lopez was upset with the West Sider . . . "Chunky," because he said quote, "What are you -- where are you from?" End quote. . . . Lopez indicated that he wanted to drive to the area of the West Side Gang territory and do a drive by shooting. Originally, Lopez asked the Garcia brothers if they would drive their car in the drive by, but the Garcia brothers declined, and instead, Cobb drove the car used in the drive by, a stolen tan station wagon. Grant indicated that . . . he, quote, "was down," end quote, for doing the drive by and

provided the gun to be used. When the station wagon left for the West Side Gang territory, Cobb was the driver, Lopez the front passenger, with Grant, Richardson and Rivera in the rear seat. The Garcia brothers followed in their car. The group drove around looking for . . . West Sider, Chunky. As the cars passed the intersection of 8th and Quintz, Lopez made statements in which, [he states] quote, "Let's kill him. Kill him right now. Let's shoot him." End quote. After passing 8th and Quintz, the cars pulled into the 7-Eleven parking lot, which is around the block from the intersection of 8th and Quintz. Mike Richardson got out of the [sic] Cobb's car because he did not want to be a part of the shooting. Lopez and [the] others ridiculed Richardson calling him a, quote, "pussy," end quote. Grant gave the gun to Lopez as the station wagon traveled back towards 8th and Quintz. At the intersection of 8th and Quintz, Cobb slowed the vehicle almost to a stop. Lopez took aim and shot several times out the window. Salvador Hernandez Pantoja was struck in the head. Cobb accelerated the car to get away.

(Resp't Ex. F at 12:24-17:22 [brackets added].)

## DISCUSSION

### I.    Existence of a Protected Liberty Interest

Before reaching the merits of Petitioner's claims, the Court addresses Respondent's argument that Petitioner has no protected liberty interest in parole which would entitle him to the protections of due process at parole suitability hearings. (Answer at 9-14.) Respondent first raised this argument after the California Supreme Court discussed various aspects of California's parole scheme in In re Dannenberg, 34 Cal. 4th 1061 (2005). Since then, however, the Ninth Circuit has rejected Respondent's argument and has made clear that "California inmates continue to have a liberty interest in parole after [Dannenberg]." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1125 (9th Cir. 2006). See also Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979). Thus, in accord with Sass, Petitioner was entitled to the protections of due process at his BPT hearings.

### II.    Due Process Claim

#### A.    Applicable Legal Standard

"In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards." Biggs v. Terhune, 334 F.3d

8

910, 913 (9th Cir. 2003).  The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole.  See Sass, 461 F.3d at 1129 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board.  Id. at 1128 (quoting Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting Hill, 472 U.S. at 457).  The some evidence standard of Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

Three Ninth Circuit cases provide the guideposts for applying the Hill "some evidence" standard on this point:  Biggs, Sass, and Irons v. Carey, No. 05-15275, slip op. 8335, 8344 (9th Cir. July 13, 2007).  Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."

9

United States District Court

For the Northern District of California

1   Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on

2   unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-

3   offense behavior in determining parole suitability.  See id. (commitment offenses in combination

4   with prior offenses provided some evidence to support denial of parole at subsequent parole

5   consideration hearing).  Sass also put to rest any idea from Biggs that the commitment crime and

6   pre-offense behavior only support the initial denial of parole.  Recently, Irons determined that due

7   process was not violated by the use of the commitment offense and pre-offense criminality to deny

8   parole for a prisoner sixteen years into his seventeen-to-life sentence.  Irons emphasized that all

9   three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to

10  deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with

11  due process, the decision was made before the inmate had served the minimum number of years

12  required by his sentence."  Irons, No. 05-15275, slip op. 8449.  Interpreting this statement from

13  Irons to suggest that the offense can only be relied on until the minimum number of years has been

14  reached would suffer the same problem that Sass identified in Biggs:  it is not the holding of the

15  case.  The dicta in Biggs and Irons are speculative and do not determine when a denial of parole

16  based solely upon the commitment offense or pre-offense behavior violates due process.  Neither

17  logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the

18  minimum number of years in his sentence, such as the fifteenth year of a fifteen-to-life sentence.

19       The upshot of these three cases is that the BPT can look at immutable events, such as the

20  nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not

21  currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to

22  those immutable events should decrease over time as a predictor of future dangerousness as the

23  years pass and the prisoner demonstrates favorable behavior (Biggs and Irons).  Sass did not dispute

24  the principle that, other things being equal, a murder committed fifty years ago is less probative of a

25  prisoner's current dangerousness than one committed ten years ago.  Not only does the passage of

26  time in prison count for something, exemplary behavior and rehabilitation in prison count for

27  something according to Biggs and Irons.  Hill's standard might be quite low, but it does require that

28

**United States District Court**
For the Northern District of California

1    the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for

2    an arbitrary decision.

3    What little guidance has come from the Supreme Court suggests that judicial review should

4    be extremely deferential to the original decisionmaker in the parole context.  In addition to the very

5    low evidentiary standard that <u>Hill</u> imposes, other Supreme Court comments suggest that the

6    judiciary should be quite mindful of the subjective and predictive nature of a parole board's

7    decision.  <u>See</u> <u>Greenholtz</u>, 442 U.S. at 13.  "No ideal, error-free way to make parole-release

8    decisions has been developed; the whole question has been and will continue to be the subject of

9    experimentation involving analysis of psychological factors combined with fact evaluation guided

10   by the practical experience of the actual parole decisionmakers in predicting future behavior.  Our

11   system of federalism encourages this state experimentation."  <u>Id.</u>

12   **B.    Parole for Murderers in California**

13   California uses indeterminate sentences for most non-capital murderers, with the term being

14   life imprisonment and parole eligibility after a certain minimum number of years.  A first degree

15   murder conviction yields a minimum term of twenty-five years to life and a second degree murder

16   conviction yields a base term of fifteen years to life imprisonment.  <u>See</u> <u>Dannenberg</u>, 34 Cal. 4th at

17   1078; CAL. PENAL CODE § 190.  The upshot of California's parole scheme described below is that a

18   release date normally must be set unless various factors exist, but the "unless" qualifier is so great

19   that parole is a rarity rather than the norm for murderers.

20

21   A BPT panel meets with an inmate one year before the prisoner's minimum eligible release

22   date "and shall normally set a parole release date . . . .  The release date shall be set in a manner that

23   will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to

24   the public, and that will comply with the sentencing rules that the Judicial Council may issue and

25   any sentencing information relevant to the setting of parole release dates."  CAL. PENAL CODE

26   § 3041(a).  Significantly, that statute also provides:  The panel shall set a release date,

27       unless it determines that the gravity of the current convicted offense or offenses, or
         the timing and gravity of current or past convicted offense or offenses, is such that
28       consideration of the public safety requires a more lengthy period of incarceration for

1    this individual, and that a parole date, therefore, cannot be fixed at this meeting.

2    Id. § 3041(b).

3        One of the implementing regulations, Title 15 of the California Code of Regulations § 2401

4    provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section

5    2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section

6    2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms

7    for offenses of similar gravity and magnitude with respect to the threat to the public."  The

8    regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable

9    for release on parole.  Regardless of the length of time served, a life prisoner shall be found

10   unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an

11   unreasonable risk of danger to society if released from prison."  CAL. CODE REGS. tit. 15, §

12   2402(a).

13       In making its determination, the parole board may consider "[a]ll relevant, reliable

14   information available," including,

15
16       the circumstances of the prisoner's social history; past and present mental state; past
         criminal history, including involvement in other criminal misconduct which is
17       reliably documented; the base and other commitment offenses, including behavior
         before, during and after the crime; past and present attitude toward the crime; any
18       conditions of treatment or control, including the use of special conditions under
         which the prisoner may safely be released to the community; and any other
19       information which bears on the prisoner's suitability for release.  Circumstances
         which taken alone may not firmly establish unsuitability for parole may contribute to
20       a pattern which results in finding of unsuitability.

21   Id. § 2402(b).

22       Circumstances tending to show unsuitability for parole include the nature of the

23   commitment offense, and consideration of whether "[t]he prisoner committed the offense in an

24   especially heinous, atrocious or cruel manner."  Id. § 2281(c).  This includes consideration of the

25   number of victims, whether "[t]he offense was carried out in a dispassionate and calculated

26   manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether

27   "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard

28   for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in

United States District Court

For the Northern District of California

12

**United States District Court**
For the Northern District of California

1   relation to the offense." Id.

2       Other circumstances tending to show unsuitability for parole are a previous record of

3   violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental

4   health problems related to the offense, and serious misconduct in prison or jail. See id.

5       Circumstances tending to support a finding of suitability for parole include no juvenile

6   record, a stable social history, signs of remorse, that the crime was committed as a result of

7   significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism

8   due to the prisoner's present age, that the prisoner has made realistic plans for release or has

9   developed marketable skills that can be put to use upon release, and that the prisoner's institutional

10  activities indicate an enhanced ability to function within the law upon release. See id. § 2281(d).

11      The regulations also contain a matrix of suggested base terms that prisoners with

12  indeterminate sentence should serve before they are released on parole.  The matrix provides three

13  choices of suggested "base terms" for several categories of crimes.  See CAL. CODE REGS. tit. 15,

14  § 2403.  If, as in Petitioner's case, the base offense is second-degree murder with the use of a

15  firearm, the matrix of base terms ranges from a low of seventeen, eighteen, or nineteen years, to a

16  high of nineteen, twenty, or twenty-one years, depending on some of the facts of the crime.[2]  See

17  id. § 2403(c).  Although the matrix is to be used to establish a base term, this occurs only once the

18  prisoner has been found suitable for parole.  See id. § 2403(a).

19      The statutory scheme places individual suitability for parole above a prisoner's expectancy

20  in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at

21  1070-71.

22

23      While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum)
        sentences should "normally" receive "uniform" parole dates for similar crimes,

24

25      [2] One axis of the matrix concerns the relationship between murderer and victim and
    the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for

26  the relationship of murderer and victim are "participating victim," "prior relationship," "no prior
    relationship," and "threat to public order or murder for hire."  The choices on the axis for the

27  circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or
    "torture."  Each of the choices are further defined in the matrix.  See CAL. CODE REGS. tit. 15,

28  § 2403(c).

subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raise "*public safety*" concerns requiring further indefinite incarceration. (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger.*

Id. at 1070 (emphasis, brackets and parenthesis in original).  Indeed, the very regulation that includes the matrix states that "[t]he panel shall set a base term for each life prisoner who is found suitable for parole."  CAL. CODE REGS. tit. 15, § 2403(a) (emphasis added).  "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually."  Dannenberg, 34 Cal. 4th at 1071 (emphasis added).  The California Supreme Court's determination of state law is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988); Sandstrom v. Montana, 442 U.S. 510, 516-17 (1979).

The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").  Granted the Ninth Circuit has stated that in some cases, "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." Irons, 479 F.3d at 665; see also Biggs, 334 F.3d at 917 n.5.

**III.   Analysis**

   **A.     Opportunity to Be Heard and Reasons for Denial**

14

United States District Court

For the Northern District of California

Having stated that California inmates still maintain a liberty interest, the Court analyzes the next prong of the <u>Biggs</u> test. Under the second prong of the <u>Biggs</u> test, the first question pertains to whether Petitioner was given an opportunity to be heard and whether he was given reasons for the parole denial. See <u>Biggs</u>, 334 F.3d at 913; <u>Sass</u>, 461 F.3d at 1126; <u>Greenholtz</u>, 442 U.S. at 16.

Petitioner fully participated in his parole hearing as evidenced by the transcript of the hearing. (Resp't Ex. F.) Throughout the hearing, Petitioner was given the opportunity to make comments or objections in response to the BPT's statements, clarify any misunderstandings and give statements regarding his parole eligibility. (<u>Id.</u>)

In addition, the BPT laid out detailed reasons for denying Petitioner parole, which are discussed further below. The Court finds that the BPT satisfied the requirements for due process under this prong.

**B.     "Some Evidence" Standard**

The next question is whether there was some evidence to support the BPT's decision to deny parole. What little guidance has come from the Supreme Court suggests that the "some evidence" standard is extremely deferential to the original decision-maker. See <u>Hill</u>, 472 U.S. at 454 (examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence; the relevant question is whether there is <u>any</u> evidence in the record that could support the conclusion reached by the decision-maker). Moreover, the Supreme Court's comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. See <u>Greenholtz</u>, 442 U.S. at 13 ("No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior.").

**1.     The 2002 Parole Hearing**

Petitioner argues that the factors used by the BPT at the 2002 hearing were not supported by some evidence, thus the denial of parole is in violation of his due process rights. (Pet. at 5.) He

claims that the BPT's denial of parole based on the unchanging circumstances of his offense and prior history and other unsubstantiated allegations violated his right to due process and deprived him of his liberty interest.  (Id.)  At the 2002 parole suitability hearing, the BPT identified several factors supporting its decision to find Petitioner unsuitable for parole:  (a) the circumstances of the murder, (b) his criminal history and prior unstable social history, (c) his need for additional self-help and/or therapy programs, and (d) the District Attorney's opposition to parole.  The BPT also found that Petitioner "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  (Resp't Ex. F at 78:11-12.)

### a.   The Commitment Offense

At the 2002 parole suitability hearing, the BPT considered the circumstances of the murder and concluded that it showed that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger if released.  (Resp't Ex. F at 78:11-13.)  The panel stated that this was so because the offense was "carried out in a manner which demonstrates an exceptional disregard for human suffering, and the motive of the crime was trivial in relation to the offense."  (Id. at 78:15-18.)  The panel then listed the fact-specific reasons it was finding Petitioner unsuitable for parole:

> These conclusions were drawn from the Statement of Facts wherein the prisoner was part of the Diablo Gang in Escondido, San Diego County.  Had a gun.  There were several of them in a car.  Gave the gun to the shooter and his crime partner Mr. Lopez, who fired at a small crowd of people.  The victim received a gunshot wound to the head, 37 year old, Salvador Pantoja.  He died from the attack.  Apparently [Pantoja] was not a rival gang member.

(Id. at 78:18-79:1 [brackets added].)

The panel reiterated the violent nature of the crime and the manner in which was carried out:

> Firstly, the commitment offense was carried out in an especially cruel manner.  Specifically, he was a member of a street gang, participated in a drive by shooting, going into rival gang territory, providing the gun to the crime partner that was sitting in the front seat.  He was in the back.  The crime partner shot about five times at a crowd.  Did hit the victim in the head killing him with a 38.  Mr. Salvador Pantoja, who was 37 years old at the time, died from this attack.  It was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive of the crime was really trivial in relation to the offense.

16

(Id. at 82:12-25.)

Petitioner's version of the crime as described in the life prisoner evaluation report also was read into the record:

> [Petitioner] states that the night 10 years ago that cost the life of Salvador Pontoy [sic] was a huge mistake.  He says there was no reason for this crime other than the stupidity of teenagers trying to impress each other.  [Petitioner] believes that no one involved intended for anyone to loose his or her life.  The recklessness of their actions did cause loss of life and deeply effected many other lives.  He says there are no excuses for what happened.  Grant states, "If it wasn't for me, Salvadore [sic] Doe Pantoja would still be alive and his family and friends would never had to have gone through what they did, as well as my family.  I am so sorry that my cowardiness [sic] and need to fit in didn't let me stop what happened and cause so much pain and the loss of life of Salvador Pantoja."

(Resp't Ex. H at 1.)

### b.    Prior Criminal and Unstable Social History

The BPT consider all the relevant information in determining Petitioner's suitability for parole.  The information considered included Petitioner's past criminal history, including involvement in other criminal misconduct pursuant to Title 15 of the California Code Regulations § 2402(b), and unstable social history.  These two factors were considered in tandem.  The BPT found that Petitioner posed an unreasonable risk of danger to society if released based on his prior criminal history.  The BPT also relied on Petitioner's unstable social history and family difficulties in reaching its decision:

> At 13, [Petitioner] was a runaway.  His parents had split up when he was rather young, had problems with the stepfather, and apparently with the stepmother. Had been bounced back and forth.  Finally ended up living with his father.  He did fall in with the gang, living the gang lifestyle, partaking in alcohol and marijuana as a teenager.  In fact, he committed this commitment offense at a young age of 16.  He did fail to profit from society's previous attempts to correct his criminality.  Those attempts did include juvenile probation.  He did some time at a boys ranch.  Was on probation, in fact, at the time of his commitment offense.  His unstable social history and prior criminality does include being a member of the Diablos [sic] Gang, participating in a couple burglaries, and also had a receiving stolen property.

(Resp't Ex. F at 79:6-23 [brackets added].)

### c.    Need for Further Self-Help or Therapy Programming

In determining whether Petitioner needed further self-help or therapy programming, the BPT considered the Life Prisoner Evaluation Report.  (Resp't Ex. H.)  That report indicated:

1

2

3

4

5

6

7

[Petitioner] was received in CC on 8/19/96 at Wasco State Prison from the California Youth Authority for Initial Processing.  He received a sentence of 16 years to Life for the offense of Second Degree Murder.  He was transferred to Salinas Valley State Prison on 10/1/96, where he was assigned to Yard barber.  Close B custody was established on 10/17/96.  He transferred to Centinela State Prison on 4/7/98.  He was assigned to Vocational Mill & Cabinet Program, he was reassigned to Vocation Drywall on 2/17/99.  Upon Completion of this program.  He remained assigned to assisting new inmates with their projects until his transfer to Correctional Training Facility on 10/18/00.  On 11/14/00 [Petitioner] was reassigned to PIA Textiles Program at CTF-North, however, due to medical restriction which the Textiles Program could not reasonably accommodate, he was reassigned to CTF-North Yard Crew, his current job.

8

9

10

(Id. at 3.)  The Board acknowledged that Petitioner received Certificates of Completion in Vocational Drywall and Mill & Cabinet, anger management and parenting classes, and a "Way to Happiness" course.  (Resp't Ex. F at 35:20-36:27.)

11

12

13

14

15

16

17

18

Although the BPT acknowledged Petitioner's favorable work evaluations, it noted that confidential materials indicated that Petitioner was involved in "disruptive activities in 1999 and 2000."  (Id. at 84:23-24.)  The BPT noted that it was concerned because these activities were consistent with the commitment offense and Petitioner's gang membership.  The BPT further noted that Petitioner posed a moderate to low degree of threat to the public if released and that prior to release, Petitioner could benefit from participating in Alcoholics Anonymous/Narcotics Anonymous.  These finding was based on review of the confidential materials dealing with Petitioner's participation in "disruptive activity."  (Resp't Ex. H at 4.)

19

20

21

22

23

24

25

26

The Mental Health Evaluation Report was also considered by the Board.  (Resp't Ex. G.)  This report indicated that the most significant risk factor for Petitioner's violence potentially increasing beyond average would be the use of alcohol and illegal drugs.  (Id. at 5-7.)  In light of Petitioner's admission of alcohol and illegal drug use, the BPT noted that there is some evidence to support the Board's finding that Petitioner would pose an unreasonable risk of danger to society if released from prison.  (Resp't Ex. F at 78:11-13.)  The panel concluded that Petitioner needed help and therapy programs because "he has not yet fully participated" in these programs.  (Id. at 80:1-5.)

27

28

### d.    District Attorney's Opposition to Parole

The Deputy District Attorney of San Diego County opposed Petitioner's suitability for

18

United States District Court
For the Northern District of California

parole.  (Resp't Ex. D.)  The District Attorney relied heavily on the facts of the case, noting that

"the facts of the crime reveal this defendant to be a callous and malevolent criminal . . . with no

respect for human life."  (Id. at 7.)  He further noted that:

> . . . [a]lthough the gang subculture is a unpopular and emerging issue in society . . .
> [Petitioner] chose to participate in deadly plan of retaliation for "disrespect" to his
> gang and his fellow Diablo gang member.  In his own gang vernacular, [Petitioner]
> was "down" for a drive by.  [He] provided both the encouragement and murder
> weapon. . . .  There is no excuse for this senseless murder.  [Petitioner] demonstrated
> his total lack of respect for the lives of others and a complete commitment to the
> violent gang subculture.  His correspondence with his codefendant COBB confirms
> his commitment to the gang lifestyle and values.
>
> [Petitioner] is a dangerous man who exhibited his propensity for violent
> crime and his commitment to a criminal lifestyle at an early age.  For the safety and
> well being of the community Keith George Grant should remain in prison for the
> most substantial portion of his adult life and not be released until society can be
> guaranteed that he is no longer a danger to others.

(Id. at 7-8 [brackets added].)

### e.    Conclusion

As noted supra, the panel identified the fact specific reasons to support its conclusion that

Petitioner was unsuitable for parole.  While Petitioner decries the use of the unchanging

circumstances of his offense (traverse at 9), a review of his parole hearing reveals that the presence

of this fact did not alone support a finding that he was unsuitable for parole.  Contrary to

Petitioner's arguments in his traverse, the BPT's findings were based on more than just the

commitment offense alone.  The records show that the BPT conducted a thorough review and

consideration of Petitioner's individual factors tending to show unsuitability and suitability for

parole.  Indeed, the BPT recognized Petitioner's extensive participation in vocational programs

(listing activities and certificates and noting that Petitioner had received no disciplinary write-ups),

educational programs and parole plans.  Nevertheless, the BPT found that Petitioner was not yet

suitable for parole because "he has not yet fully participated . . . in beneficial self-help and therapy

programming," would pose an unreasonable risk of danger to society or threat to public safety, has

a history of prior criminality and unstable social history and the District Attorney's opposition to

parole.  ((Resp't Ex. F at 78:11-13; 80:1-5, Resp't Ex. H.)

19

**United States District Court**
For the Northern District of California

1   Accordingly, the Court finds that there was some evidence to support the BPT's conclusion

2   to deny Petitioner parole.  <u>Hill</u>, 472 U.S. at 455-56.

3   **2.    <u>State Court Denial</u>**

4   On state habeas corpus review, the San Diego County Superior Court went through each of

5   the factors relied on by the BPT to determine whether there was some evidence to support the

6   decision.  (Resp't Ex. J.)  The court issued a reasoned opinion on the merits of Petitioner's claims,

7   and concluded that "[t]he Board's findings with respect to these considerations were adequately

8   supported by the record."  (<u>Id.</u> at 2.)  The superior court found the BPT's reliance on Title 15 of the

9   California Code of Regulations § 2401(c)(1) was supported by the evidence:

10          It is true that Petitioner did not pull the trigger.  Nevertheless, although he
11      failed to disclose this fact in his petition, he provided the gun used to commit the
        murder and accompanied the shooter, a fellow gang member to the scene of the
12      crime with full knowledge of what was about to occur.  Multiple shots were fired
        into a crowd of people standing on the sidewalk.  An innocent man was shot in the
13      head and died.

14   (<u>Id.</u> at 3.)  The superior court found these facts satisfied four out of five of the criteria pursuant to

15   Title 15 of the California Code of Regulations § 2401(c)(1)(A-E).

16   On February 27, 2004, the California Court of Appeal also issued a reasoned opinion

17   addressing the merits of Petitioner's claims.  (Resp't Ex. K.)  The state appellate court found that the

18   circumstances of the commitment offense tended to show unsuitability.  (<u>Id.</u> at 2.)  Specifically, that

19   the BPT's finding that the commitment offense was especially cruel and callous was supported by

20   "the facts of the crime."  (<u>Id.</u>)  Of great import to the state appellate court was the facts of the crime

21   as recited by the Board.  The court noted:

22          The circumstances of the crime provide some evidence to support the Board's
23      decision.  The fact that [Petitioner] pleaded guilty and was not the shooter were only
        two of the many factors considered by the Board and [Petitioner] was not guaranteed
24      a fixed term by pleading guilty.

25   (<u>Id.</u>)  Because the California Court of Appeal's decision is the last reasoned decision regarding

26   Petitioner's challenge to the 2002 hearing, it is this decision which this Court reviews under 28

27   U.S.C. § 2254(d).  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423

28   F.3d 1085, 1091-92 (9th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 2041 (2006).

**United States District Court**
For the Northern District of California

1

The state appellate court reviewed "the factual basis of [the Board's] decision denying

2

parole in order to ensure that the decision comports with the requirements of due process of law."

3

(Id. at 2 [citing In re Rosenkrantz, 29 Cal. 4th at 656].)  The court concluded that "some evidence"

4

supported] . . . the Board's decision."  (Id.)  The court further noted that the BPT relied on several

5

noted factors to determine that Petitioner was not suitable for parole.

6

The Court finds that the state court's decision to uphold the BPT's findings was not based on

7

an unreasonable determination of the facts in light of the evidence presented in the state court

8

proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable application of

9

clearly established federal law, id. § 2254(d)(1).

10

Having reviewed the facts of the crime as recited by the BPT and the state court, and the

11

other reasons stated for finding Petitioner ineligible for parole, the Court finds that there was some

12

evidence in the record to support the BPT's decision.

13

Accordingly, Petitioner's due process challenge to the denial of parole by the BPT is

14

DENIED.

15

**C.**     **Other Arguments**

16

Petitioner makes two additional arguments: (1) that his plea agreement is invalid under the

17

Due Process Clause as the BPT and the District Attorney withheld his reciprocal benefit of lessened

18

punishment by recharacterizing his offense as a higher degree than that to which he pled guilty and

19

(2) the BPT is systematically biased in their decision making by denying parole to almost every

20

inmate and 100% of administrative appeals in violation of state law requiring parole normally be

21

granted, depriving Petitioner of his rights under the Due Process Clause.

22

23

**1.**     **Breach of Plea Agreement**

24

Petitioner argues that his plea agreement is invalid under the Due Process Clause because

25

"the Board and District Attorney withheld his reciprocal benefit of lessened punishment by re-

26

characterizing his offense as a higher degree than that to which he pled guilty."  (Pet. at 5; Traverse

27

at 23.)  Petitioner contends that it was his understanding that his plea of guilty meant he "would

28

**United States District Court**
For the Northern District of California

serve a term in prison closely approximating his minimum (uniform) term and then he would be released on parole." (Pet. at 15 [parenthesis in original].) Petitioner also raises a "benefit of the bargain" claim. (Id.) Petitioner's premise is that by denying him parole, the BPT breached the plea agreement, in violation of due process and thus rendered his acceptance of the plea involuntary. (Traverse at 26.)

Respondent argues that "neither Petitioner's plea agreement (ex. B) nor the minutes of the sentencing hearing (ex. C) contain any promises or agreements by the District Attorney's Office to induce Petitioner to plead guilty to second-degree murder other than the agreement to dismiss the remaining charges against him." (Answer at 19.) Respondent further contends that the denial of parole did not deprive Petitioner of the benefit of his bargain under the plea agreement because the "Board is required to consider all relevant, reliable information available in determining parole suitability." (Id. at 20.)

On state habeas corpus review, the San Diego County Superior Court found that Petitioner's claim "is based on several false assumptions." (Resp't Ex. J at 5.) The court rejected these assumptions, noting that the factors set forth in Title 15 of the California Code of Regulations § 2402 apply equally to first- and second-degree murders. (Id.) The California Court of Appeal found that "Petitioner was not guaranteed a fixed term by pleading guilty." (Resp't Ex. K at 2.)

Petitioner does not challenge the recitation of facts. However, he does argue here, as he did in state court, that his plea agreement is invalid under the Due Process Clause because the Board and District Attorney re-characterized his commitment offense as one carrying a higher penalty at the June, 2002 parole hearing. (Pet. at 5.) He repeats these arguments in his traverse. (Traverse at 23-26.)

"[D]ue process rights conferred by the federal constitution allow [a defendant] to enforce the terms of the plea agreement." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003). Plea agreements are construed using the ordinary rules of contract interpretation. See id. at 1159. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled."

United States District Court

For the Northern District of California

1    Santobello v. New York, 404 U.S. 257, 262 (1971); see also Brown, 337 F.3d at 1159 (holding

2    prosecutor's promise that petitioner would be released on parole after serving half the minimum

3    sentence discipline-free was binding).

4         Here, assuming all of Petitioner's allegations as to his plea agreement are true, he has failed

5    to state a claim for relief because he has not alleged that the District Attorney's Office made any

6    promise that he would be released on parole.  See Murphy v. Espinoza, 401 F. Supp. 2d 1048, 1053

7    (C.D. Cal. 2005.)  Petitioner's understanding that he would be paroled after "the accepting prisoner

8    serves a term in prison closely approximating his minimum (uniform) term" is immaterial because

9    that understanding was not based on any promise made by the District Attorney's Office.  See id. at

10   1053.  Indeed, Petitioner does not dispute that he was sentenced to a term of fifteen years to life.

11   Nor does he assert that the Prosecutor or the court affirmatively promised him that he would serve a

12   minimum period for pleading guilty to second-degree murder.  He merely seizes on his own belief

13   that his "crime being second-degree murder is a primary substantive benefit."  (Pet. at 14.)  In the

14   absence of an agreement that can be specifically enforced, the BPT is not required to find Petitioner

15   eligible for parole upon completion of a minimum term.  Rather, consideration of parole suitability

16   remains within the sound discretion of the Board.  CAL. PENAL CODE § 3041.

17

18        Furthermore, Petitioner fails to provide any supporting facts and/or legal precedent to show

19   that the terms of his plea agreement were violated.  "[C]onclusory allegations which are not

20   supported by a statement of specific facts do not warrant habeas relief."  James v. Borg, 24 F.3d 20,

21   26 (9th Cir. 1994).  Moreover, there is no claim that petitioner's plea was not knowing and voluntary

22   when made.  Consequently, Petitioner's right to due process was not violated when the Board denied

23   him parole in 2002.  The Court concludes that the state court's decision to uphold the BPT's findings

24   was not based on an unreasonable determination of the facts in light of the evidence presented in the

25   state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable application

26   of, clearly established federal law, id. § 2254(d)(1).  Accordingly, Petitioner is not entitled to relief

27   on his due process claim based on a breach of his plea agreement.

28        **2.    Systematic Bias Against Granting Parole**

23

**United States District Court**
For the Northern District of California

1    Petitioner alleges that the BPT is systematically biased in their decision making by denying

2    parole to almost every inmate and 100% of administrative appeals in violation of state law requiring

3    parole normally be granted, depriving him of his rights under the Due Process Clause.  He presents

4    statistical data, without providing citation or source, demonstrating that parole is denied to

5    approximately 94% to 99% of inmates appearing before the parole board.  The Court finds that

6    Petitioner's allegations are insufficient to support his allegations of systematic bias.

7    A state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in

8    custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C.

9    § 2241(c)(3).  A petitioner has the burden of alleging specific facts that show a federal claim is

10   presented, or the petition is subject to dismissal.  Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.

11   1995).  Specific factual allegations, not conclusions, are required.  Id.; Boehme v. Maxwell, 423

12   F.2d 1056, 1058 (9th Cir. 1970).

13   A "'fair trial in a fair tribunal is a basic requirement of due process.' . . .  This applies to

14   administrative agencies which adjudicate as well as to courts."  Withrow v. Larkin, 421 U.S. 35, 46

15   (1975) (citations omitted) (combination of investigative and adjudicative functions does not

16   necessarily show a biased decision-maker); see also Morrissey v. Brewer, 408 U.S. 480, 489 (1972)

17   (due process requires neutral and detached decision-maker for parole revocation hearing).

18

19   Here, the Court finds that Petitioner's allegations are insufficient to entitle him to habeas

20   relief.  Even if Petitioner established factual support for this systematic bias claim, there is no

21   evidence in the record indicating that this bias affected the BPT's decision or served as the basis for

22   parole denial.  To the contrary, the transcript from Petitioner's parole hearing (Resp't Ex. F)

23   demonstrates that he received an individualized assessment of his potential parole suitability.  The

24   state court "independently reviewed the record before the Board with deference to the Board's 'broad

25   discretion' in parole matters."  In re Rosenkrantz, 29 Cal. 4th at 656.  Accordingly, Petitioner's

26   reliance on the high percentage of parole denials for life inmates provides no proof of the BPT's

27   systematic bias against parole.  Cf. California Dept. Of Corrections v. Morales, 514 U.S. 499, 510-11

28   (1995) (citing that ninety-percent of all California inmates are found unsuitable for parole as evidence

24

1   that deferring annual parole suitability hearings was lawful and reasonable).

2       Moreover, even if Petitioner could establish that the BPT, in 2002, had a bias against paroling

3   prisoners convicted of murder, and that Petitioner was prejudiced thereby, Petitioner has already

4   obtained the relief to which he would be entitled.  "[T]he habeas remedy [for a biased board] would

5   be to order a new hearing by a decision-maker that was not biased."  See Rio v. Bd. of Prison Terms

6   Comm'rs, 2006 U.S. Dist. LEXIS 94464, at *9 (N.D. Cal. 2006).

7       The Court cannot conclude that the BPT in this instance was systematically biased in denying

8   parole.  Upon a review and consideration of the evidence presented at the parole hearing, the Court

9   must conclude that there was presented, at least, "some evidence" to support the BPT's decision to

10  deny parole and that the BPT reviewed and considered pertinent criteria in making its determination

11  that Petitioner was, at the time, unsuitable for parole.  Furthermore, the state appellate court rejection

12  of Petitioner's claim was not contrary to or an unreasonable application of the Hill "some evidence"

13  standard.  28 U.S.C. § 2254(d)(2).  Accordingly, Petitioner is not entitled to relief on his due process

14  claim based on the BPT's systematic bias against granting parole.

### CONCLUSION

17      For the foregoing reasons, the petition for a writ of habeas corpus is DENIED as to all claims.

18  The Clerk of the Court shall enter judgment and close the file.

19      IT IS SO ORDERED.

20  DATED: 8/13/07

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

United States District Court
For the Northern District of California

1

2

3

4

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

5

6

GRANT,

7

Plaintiff,

Case Number: CV04-02449 SBA

8

v.

**CERTIFICATE OF SERVICE**

9

HAMLET et al,

10

Defendant.

11 _____/

12

13

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

14

15

16

That on August 13, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

17

18

19

Keith G. Grant H-82998

20

Correctional Training Facility - Soledad
P.O. Box 689

21

Soledad,  CA 93960-0689

22

Dated: August 13, 2007

23

Richard W. Wieking, Clerk
By: LISA R CLARK, Deputy Clerk

24

25

26

27

28

United States District Court
For the Northern District of California